(Decided 20th June, 1872.)

---

FRANCES JONES, Administratrix of ANDREW D. JONES, deceased, *vs.* GEORGE W. JONES, JOSHUA A. JONES, SARAH ANN ROBINSON, and others.

*Distribution of the Estate of an Intestate, who had been a Slave—Marriage between Slaves—Practice— Evidence as to Pedigree—Act of 1868, ch. 116, relating to the competency of Witnesses.*

David Jones, a slave, intermarried with a free woman; subsequently, in 1819, he became free by deed of manumission; the parties lived together as man and wife, and acknowledged and treated each other as such, and were so recognized by all who knew them, long after his emancipation, and up to the time of his wife's death. They had children. A brother of David who became free by manumission in 1815, died in August, 1870, intestate, possessed of a large personal estate, leaving a widow but no child, and no relatives other than the children

of his brother David, who had died some years previously. On a petition filed by the children of David Jones; claiming a distributive share of the intestate's estate, it was HELD :

That the marriage of David Jones was valid, and his children were entitled to one-half of their uncle's estate, his wife being entitled to the other half.

A marriage between slaves is made valid by the ratification of the parties after they become free.

An objection to an interrogatory to a witness on the ground that it is "leading," being merely to the form of the question, should be made at the time the question is propounded, that the party may have an opportunity of remodelling it; and if not then made, it cannot be made afterward.

Declarations of deceased members of a family as to pedigree, are always admissible in evidence.

On a petition by the nephews and nieces of an intestate, claiming to be his next of kin and heirs at law, and asking to share in the distribution of his estate, the whole of which was claimed by his wife to whom letters of administration had been granted, the petitioners. are not incompetent as witnesses under the Act of 1868, ch. 116.

APPEAL from the Orphans' Court of Baltimore City.

On the 21st of September, 1871, George W. Jones, Joshua A. Jones, Sarah Ann Robinson, Ellen McComas and Georgeanna Russell, filed their petition in the Orphans' Court of Baltimore City, alleging that they were the only children of David Jones, deceased, who was the brother of Andrew D. Jones, who departed this life on or about the 10th of August, 1870, intestate, leaving a widow but no child, nor brother or sister, nor the child of a brother or sister, except the petitioners. The petition averred the granting of letters of administration upon the estate of the intestate on the 2nd of September, 1870, to Frances Jones, his widow, and that more than a year had since elapsed and she had neglected to render her account of administration. The petitioners prayed that the administratrix should be cited to settle her accounts, and be required, after the payment of debts, to distribute to them their proportion of the intestate's estate according to their

respective interest therein.  By agreement, the petition was considered as amended, so far as to state that Ellen McComas and Georgeanna Russell, sued by their next friend, George W. Jones, they being married women.  The administratrix rendered her account, having previously filed an answer in her personal capacity as widow of the deceased, denying the relationship of the petitioners to him, and putting them to the proof.  A general replication was filed.  A large amount of testimony was taken, and after argument, a majority of the Court decided that the petitioners were the legitimate issue of David Jones, and as such entitled to their proportion of the estate of the intestate, Andrew D. Jones, and passed a decree directing the administratrix to distribute one-half of said estate to the petitioners and the other half to herself as widow.  From this decree the administratrix appealed.

The cause was argued before BARTOL, C. J., STEWART, BOWIE, GRASON MILLER and ALVEY, J.

*William H. Dawson and George H. Williams,* for the appellant, argued

That the decree below should be reversed for the following reasons :

*First.*—Because the testimony upon which the appellees relied to prove their relationship to Andrew, consists of mere admissions and declarations pretended to have been made by Andrew, and as to the time of which all the witnesses (with one exception) are unable to specify, and the testimony being of a kind always discountenanced by Courts because of the case with which it is fabricated, and the impossibility of its contradiction.  *Malin vs. Malin,* 1 *Wendell,* 652; *Law vs. Merrills,* 6 *Wendell,* 277 ; *Williams vs. Williams,* 4 *Eng. Ecc. Rep.,* 417 ; *Myers vs. Baker, etc., Hardin's (Ky.) Rep.,* 549 ; 1 *Sharswood's Black.,* 374.

*Second.*—Because the appellees were permitted to testify to prove their own case, notwithstanding the *Act of* 1868, *ch.*

116, declaring them incompetent for that purpose; the appellant being sued in her administrative capacity, had a vital interest in the fund in her hands, for the protection not only of her own interests, but also for the protection of her administration bond. *Act of* 1868, ch. 116; *Johnson vs. Heald*, 33 *Md.*, 352; *Denison vs. Denison*, 35 *Md.*, 361.

*Third.*—Because David and Andrew D. Jones having both been born slaves, were mere chattels in the eye of the law, and incapable of having or transmitting any inheritable blood as to each other. *Cobb on Slavery*, secs. 262, 275; *Dulaney's Opinion*, 1 *H. & McH.*, 560; *Jackson vs. Lervey*, 5 *Cowen*, 397; *Malinda vs. Gardner*, 24 *Ala.*, 719.

That their mother died a slave—no deed of manumission, or liberation by any will having been proved in this case, *Anderson vs. Garrett*, 9 *Gill*, 128, 136.

*Fourth.*—That conceding David and Andrew to have been brothers by the same mother, the decree below should be reversed, because the proof shows that at the time it is pretended David married Hannah Williams, he was a slave, and as such not able, legally, to contract marriage. *Cobb on Slavery*, secs. 270, 275; *Dulaney's Opinion*, 1 *H. & McH.*, 560; 1 *Bishop on Mar. & Div.*, secs. 157, 158; *Howard vs. Howard*, 6 *Jones'* (*N. C.*) *Rep.*, 235; *State vs. Samuel*, 2 *Dev. & Battle*, 177; *Malinda vs. Gardner*, 24 *Ala.*, 719; *Smith vs. The State*, 9 *Ala.*, 990; *Jackson vs. Lervey*, 5 *Cowen*, 397; *Williams, Adm'x, vs. Johnson, Adm'x*, 30 *Md.*, 507.

*Fifth.*—That by the rule of law, the connection having commenced at a time when David was incapable of contracting marriage, the connection must continue as it commenced, unless there be some overt act of marriage by the parties thereafter, at a time when they were competent legally to contract, and of which there is no evidence, as all the witnesses who attempt to prove the marriage, fix the time thereof to be about a year prior to the birth of the eldest of the appellees, and at a time when David was undoubtedly a slave. *Cunningham vs. Cunningham*, 2 *Dow's Rep.*, 482; *Lapsley vs.*

Jones, Adm'x, *vs.* Jones, *et al.*

*Grierson*, 1 *H. of Lords Cases*, 498; *Howard vs. Howard*, 6 *Jones' (N. C.) Rep.*, 238.

*Sixth.*—That as there never was a legal marriage between David Jones and Hannah Williams, the appellees are not the heirs of David, but the illegitimate offspring of Hannah Williams, and as such could not inherit from David; nor if they were, could they bridge over the chasm between David and Andrew, who, born as slaves, could not, in law, be brothers to each other. The doctrine of inheritance by illegitimates, as contained in the Code, would not sanction also the piling of illegitimacy upon illegitimacy, even if the difficulty of slavery did not preclude all idea in this case of any inheritable blood.

*William Shepard Bryan*, for the appellees.

It is shown without the least contradiction, that Andrew D. Jones and David Jones were brothers, and that the petitioners are the children of David. The declarations of the mother of Andrew and David, that they were her children were evidence; and also those of Andrew, that David was his brother, and also those of David that the petitioners were his children. *Cope vs. Pearce*, 7 *Gill*, 248; *Charlotte Hall School vs. Greenwell*, 4 *G. & J.*, 416; *Craufurd vs. Blackburn*, 17 *Md.*, 54.

If the entries in the Bible produced in evidence, were correctly copied from the original Bible, David married his wife Hannah during his term of slavery. If they were not correctly copied, the time of the marriage is left uncertain by the evidence, but the just conclusion from all the circumstances would be that David was free at the time of his marriage.

Assuming, for the sake of the argument, that the marriage took place during David's slavery, the children are legitimate. The matrimonial union between slaves never was unlawful by the laws of Maryland; but it conferred none of the civil rights attached to the marriage of free persons, because slaves were not capable of acquiring these rights.

The moral relation of matrimony could be assumed by them, and was to some extent the subject of statutory regulation. *Act of* 1777, *ch.* 12. The union not being unlawful, and having all the moral attributes of marriage, the slave, as soon as he was emancipated, could invest it with the civil consequences. He was then able to make a contract, and he was competent to adopt and ratify the imperfect and ineffectual contract of marriage made during his disability. And upon this ratification, all the civil consequences of marriage ensued, because the only impediment which existed was then removed. *Girod vs. Lewis,* 1 *Cond.* (*La.*) *Reps.,* 505.

A marriage void *ab initio,* by reason of the incapacity of the parties, may be valid by ratification after the removal of the disability; and no new celebration is requisite—as in case of lunatics. *Cole vs. Cole,* 5 *Sneed,* (*Tenn.*) 57; *Wightman vs. Wightman,* 4 *Johns. Ch. Rep.,* 343. And in case of infants, where the male is under fourteen and the female under twelve. 1 *Blacks. Comm.,* 436.

By the Civil Law, slaves could not contract marriage, but they lived together in a peculiar relation called contubernium, which conferred no civil rights. Yet when they were emancipated, their children, born during slavery, the offspring of this connection, were capable of inheriting from each other and from their parents. *Code Justinian, Liber* 3, *title* 7.

If the question were doubtful before, it has been set at rest by Act of Congress, 1866, ch. 31. Whatever disabilities may have followed the slave, they have all been removed by this Act. If because he was born in slavery, he had no inheritable blood, this Statute supplies the deficiency; it provides that "without regard to any previous condition of slavery, or involuntary servitude," the former slave shall be fully competent "to inherit, purchase, lease, sell, hold and convey real and personal property." It is an act of naturalization which, Lord COKE informs us, cancels all defects, and has a retrospective energy. *Coke Litt.,* 129 *a; 1 Blackstone's Comm.,* 374.

The Act of 1868, ch. 116, does not affect the competency of the evidence of the petitioners; but if it did, the case is established without the aid of their testimony.

They were not asserting a right founded on a contract with the deceased, or on a cause of action affecting the respondent as representative of the deceased. The decision of the question would not increase or diminish the assets of the estate. The deceased never had any possible interest in it. And his administratrix in her representative capacity could have none. In this controversy she is litigating for her own personal interest, and the interests of the estate are not at all involved. The only question is whether she is to have all the estate, or to divide it with the petitioners.

GRASON, J., delivered the opinion of the Court.

The main questions arising upon this appeal are, whether the appellees are nephews and nieces of Andrew D. Jones, deceased, and, if they are, whether they are entitled to a distributive share of his estate? After a careful examination of the evidence in the record, we are satisfied that Andrew D. Jones and David Jones were the sons of Kate Jones, and brothers, and that the appellees are the children of David and Hannah Jones. Without entering, in this opinion, into a detailed review of the evidence, it is sufficient to say that it leaves no doubt that David Jones was married, while yet a slave, to Hannah Williams, a free woman, and that some of her children were born before David became free and some afterwards, and that David and his brother Andrew were both manumitted by Margaret Gardner by deeds, both of which were executed on the 10th of November, 1814, and recorded on the 26th of the same month—David's freedom to commence five years and Andrew's six months thereafter. David and Hannah lived together as man and wife, and acknowledged and treated each other as such, and were so recognized by all who knew them, long after David's emancipation, and up to the time of Hannah's death, which appears to have

taken place about thirty years ago; and David died twelve or fifteen years ago. Andrew died in August, 1870, leaving the appellant his widow, but no child and no relatives other than the appellees, who are his nephews and nieces. They are therefore entitled to their distributive share of his estate, unless they are incapable of inheriting by reason of their father and uncle having been at one time slaves. It has been urged in argument that the marriage of David and Hannah was void by reason of its having taken place while David was a slave, and that therefore their children had no heritable blood; and several authorities were referred to in support of this proposition. Among these is an opinion of DANIEL DULANEY, Esqr., given in 1767, and contained in 1 *H. & McH.*, 559. The facts upon which that opinion was based were, that A, a mulatto slave, obtained his freedom and purchased land in fee, and died intestate and without issue. B, also a mulatto slave, and brother of A, obtained his freedom after the death of A, and died, leaving children by a slave woman, whose freedom he had purchased—some of the children having been born during the slavery of their mother and purchased with her, and some having been born afterwards—and the question was, whether these children could inherit the property of which their uncle died seized, or whether it escheated to the State. It will at once be seen from the statement of the facts, that B could not inherit, nor, after his death, could his children; because at the time of A's death, B and his children, then born, were all slaves, and there being no one then in existence capable of inheriting, the property escheated. It does not appear from the facts, stated in the opinion, that B and the mother of the children had ever been married, and this fact alone, if there had been no other impediment, would have been sufficient to prevent the children from inheriting A's property. In the other cases, referred to by the appellant's counsel, the parties claiming the property were slaves at the death of the party from whom they claimed to inherit, and of course could not take the

property.   But in the case before us, the appellees were born
of a free woman, and were themselves free from their birth
and capable of inheriting.    Their father, it is true, had been
a slave at one time, but his slavery did not affect his chil-
dren's condition; and he became free fifty years before
Andrew's death.   Mr. DULANEY argues that a slave could
not marry because he was a slave, and a contract of marriage
would be an invasion of the master's rights.    But ten years
after his opinion was prepared, by the Act of 1777, ch. 12,
sec. 11, the Legislature authorized slaves to marry with the
assent of their owners, and, whatever the law may have been
in this respect before, they could lawfully marry thereafter.
Although the marriage would not confer civil rights upon
them, and in no manner change or affect the relation of
master and slave, yet it was legalized, and consequently the
issue would be legitimate.    As the proof is sufficient to sat-
isfy us that David and Hannah Jones were married, we must
presume, nothing appearing to the contrary, that they were
married with the consent of the mistress of David.    When
he afterwards acquired his freedom, certain civil rights vested
in him, as a consequence, such as the right to acquire by pur-
chase or inheritance, and to hold and dispose of property.
Upon his death the property of which he might then be
seized or possessed would descend upon his children, they
being free.

Mr. DULANEY further argues that the validity of a mar-
riage depends upon the immediate effect of its celebration, and
that, if it is not valid then, it could not be made good by the
subsequent accidental circumstance that the parties acquired
their freedom, and to illustrate the argument, he puts the case
of a man marrying a woman while he had a wife still living,
and says that the accidental circumstance of the first wife
dying would not make the second marriage valid.    It is true
that in such a case the second marriage would not be made
valid by the death of the first wife, because a marriage under
such circumstances is a great moral wrong, and a high crime

under the law. But there are cases in which marriages, contracted between parties not capable of contracting at the time of the marriage, are made valid by the subsequent ratification of the parties, as in the cases of lunatics and infants, and that without any other or new celebration. *Cole vs. Cole, 5 Sneed,* 63; *Wightman vs. Wightman, 4 Johns. Chan. Reps.,* 345; 1 *Blackst. Comm.,* 436. We think that the same law should apply to cases of marriages between slaves, who ratify the marriage after they become free. BISHOP, in his work on *Marriage and Divorce, vol.* I, *sec.* 162, says, in referring to the case of *Howard vs. Howard, 6 Jones' (N. C.) Reps.,* 235: "In the facts of this case there is involved the particular matter upon which the writer of these volumes deems that the decision, in all such cases, ought in principle to turn. If, after the emancipation, the parties live together as husband and wife, and, if before emancipation, they were married in the form which either usage or law had established for the marriage of slaves, this subsequent mutual acknowledgment of each other as husband and wife, should be held to complete the act of matrimony, so as to make them lawfully and fully married from the time at which this subsequent living together commenced." No legal marriage could be contracted by slaves under the civil law, yet it recognized a relation between them, which was termed conturbernium, and, although this relation conferred no civil rights upon the parties, yet, when they became free, their children being free, although born in slavery, could inherit from each other and from their parents. *Code Justinian, Lib.* 3, *title* 7, *p.* 32.

After David Jones became free, he continued to live with Hannah as his wife to the time of her death, they recognizing and treating each other as husband and wife, and taking their children to the church which they were in the habit of attending, to be baptized. We should be extremely reluctant to hold a marriage, which had taken place with the consent of the owner of slaves, and under the sanction of a Statute, and thus ratified after they became free, to be void, and the issue

of it bastards, merely because the parties to it were slaves at the time it was celebrated, and thus prohibit them from inheriting property from their parents or from each other after they became free. There is no doubt that the appellees are capable in law of inheriting from their uncle Andrew D. Jones, and are entitled to a distributive share of his estate.

Exceptions were taken by the appellant to certain interrogatories propounded to witnesses by the counsel of the appellees, as leading. They go to the form of the question merely, and should have been made and noted at the time they were put, in order that the party might have had an opportunity of remodelling them. If not made at that time, they cannot be made afterwards. *Smith vs. Cooke,* 31 *Md.,* 179.

Exceptions were also taken to the admission in evidence of the declarations of Kate, David and Andrew D. Jones, as to the relationship existing between them, and between them and the appellees. Evidence of declarations of the members of a family as to pedigree, are always admissible. *Charlotte Hall School vs. Greenwell,* 4 *G. & J.,* 416 ; *Cope's Adm'r. vs. Pearce,* 7 *Gill,* 262-263 ; *Craufurd vs. Blackburn,* 17 *Md.,* 54.

It was also argued that the petitioners were incompetent as witnesses under the Act of 1868, ch. 116, the other party being administratrix. It is very clear that they do not come within either the letter or spirit of the exception, which is alleged to exclude them. The object of the Act was to place parties upon an equal footing and to exclude the other party, when one party to the contract, &c., was dead, lunatic, &c. In the case before us there was no contract between the deceased and the appellees, which the latter are endeavoring to enforce against his estate, nor is this a suit against his administratrix for the purpose of establishing a charge against her intestate or his estate. But it is a contest between his widow and the appellees, who claim to be next of kin and heirs-at-law of the intestate, as to the manner in which his estate shall be distributed, the widow claiming the whole, and the appellees the one-half. There is nothing in the Act of

1868 to exclude them, and they are clearly competent. It was also urged that the evidence given by the appellees, who were examined as witnesses, is not to be relied on, inasmuch as they swore to having seen some of the entries made in the bible, produced at the trial and which they swore was their father's family bible, when the bible itself shows that it was published after the time when some of those entries bear date. It will however be seen from the evidence that only one of the appellees can write, and he only sufficiently well to sign his name, and that the bible referred to passed through the hands of several members of the family, and it may be that the entries may have been copied from the bible in which they were originally made into that, which was produced at the trial, and the latter was taken by these illiterate and ignorant people for the former, especially as it is well known that a very large number of bibles of similar size and appearance are constantly being distributed by the Bible Societies of the State and counties. These three appellees who testified may, therefore, have been readily mistaken as to the bible, and yet not have been guilty of wilful falsehood. But even if their testimony is thrown out of the case, the facts, necessary to the establishment of the appellees' case, are proved by ten or eleven other witnesses who are entirely uncontradicted by those who testified in behalf of the appellant. The testimony of the latter was altogether of a negative character, that they had no knowledge whether or not there was any relationship between David and his children, and Andrew D. Jones.

We concur in the rulings of the Orphans' Court, and are of opinion that the appellees are entitled to one-half of their uncle's estate, and the decree appealed from will be affirmed.

*Decree affirmed.*

(Decided 20th June, 1872.)